STATE OF NEBRASKA, APPELLEE, V.
JOHNNY SEGURA, JR., APPELLANT.
660 N.W.2d 512

Filed May 9, 2003.   No. S-02-948.

Bernard J. Straetker, Scotts Bluff County Public Defender, for appellant.

Don Stenberg, Attorney General, Marilyn B. Hutchinson, and Mark Raffety for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

Johnny Segura, Jr., was charged with and convicted of attempted theft and criminal mischief of over $300. He was sentenced to consecutive terms of 2 months' imprisonment for

attempted theft and 1 year's imprisonment for criminal mischief. Segura appeals the judgments of conviction and sentences.

## SCOPE OF REVIEW

■ Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Johnson*, 261 Neb. 1001, 627 N.W.2d 753 (2001).

■ Sentences within statutory limits will be disturbed by an appellate court only if the sentences complained of were an abuse of judicial discretion. *State v. Canady*, 263 Neb. 552, 641 N.W.2d 43 (2002).

## FACTS

On May 16, 2002, Barbara Akin and Lucas Benzeiz were working at a restaurant in a shopping mall in Scottsbluff. Akin and Benzeiz left the restaurant around 9:30 p.m. and walked toward Akin's sport utility vehicle (SUV) in the mall parking lot. As they approached the SUV, they noticed that a door was open and that the dome light was on. Someone was in the front seat looking down at the "control panels" with one leg hanging out of the driver's-side door.

When Akin and Benzeiz were within 10 or 12 feet of the SUV, a man exited the SUV and started walking away. Akin asked, " 'What are you doing with my car[?]' " and the man responded, " 'Nothing.' " She then asked, " 'No, what did you do to my car[?]' " and the man took off running.

Akin observed that the man was about 6 feet tall, had a thin face, and was wearing jeans, a burgundy Nike wind jacket with a white stripe on the sleeve, and a white baseball cap. Benzeiz began chasing the man and told Akin to get into her SUV. Akin immediately called the 911 emergency dispatch service while she

drove toward Benzeiz to pick him up. Benzeiz had run halfway across the parking lot, and he could see that the man was running toward a bank.

Benzeiz saw the man near the bank but then lost sight of him. Akin and Benzeiz drove to the bank parking lot and observed the man running along 20th Street. As they continued their pursuit, Akin and Benzeiz again temporarily lost sight of the man but soon noticed him running across a sidewalk in front of a building called the Loft. They pulled into a nearby parking lot and saw the man run between the Loft and a neighboring Chinese restaurant. The man then ran in the direction of the street as they circled around the buildings.

A police officer arrived, and Akin told the officer that the perpetrator was a Hispanic male wearing a white baseball cap and that he was behind the building. After the officer went around to the back of the building, Akin and Benzeiz saw the man run between the Loft and the restaurant. Two more police officers arrived, and the man, later identified as Segura, was caught and arrested. The entire incident lasted between 5 and 7 minutes.

Akin and Benzeiz testified that Segura was the man they had seen getting out of Akin's SUV and had pursued. They identified him by his clothing and testified that each time they saw him during their pursuit, they knew it was the same man because he was wearing the burgundy jacket and white cap.

The damage to Akin's SUV included a broken triangular window on the rear driver's-side door. A stereo and the console around the stereo were also damaged. It cost Akin $581.56 to have the damage repaired and the stereo replaced.

Segura was charged with attempted theft, a Class III misdemeanor, and criminal mischief of over $300, a Class IV felony. At the close of the State's case, Segura moved for a directed verdict, which motion the district court overruled. Segura did not present any evidence. The jury returned verdicts of guilty on both counts and found the pecuniary loss to be $581.56.

Subsequent to Segura's conviction, but prior to sentencing, criminal mischief causing a pecuniary loss of $581.56 was reclassified by the Legislature from a Class IV felony to a Class I misdemeanor, and Segura received the benefit of the change for purposes of his sentence. The district court sentenced Segura to

consecutive terms of 2 months' imprisonment for attempted theft and 1 year's imprisonment for criminal mischief. Segura appeals.

## ASSIGNMENTS OF ERROR

Segura assigns, restated, that the evidence presented by the State was insufficient to support the convictions and that the district court erred (1) in refusing to sustain his motion for directed verdict and (2) by imposing excessive sentences.

## ANALYSIS

### SUFFICIENCY OF EVIDENCE AND DIRECTED VERDICT

Segura argues that the evidence presented by the State was insufficient to support his convictions. He asserts that the district court erred in refusing to sustain his motion for directed verdict.

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Johnson*, 261 Neb. 1001, 627 N.W.2d 753 (2001).

In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. *State v. Canady*, 263 Neb. 552, 641 N.W.2d 43 (2002). If there is any evidence which will sustain a finding for the party against whom a motion for directed verdict is made, the case may not be decided as a matter of law, and a verdict may not be directed. *Id.*

Segura argues that the evidence presented by the State lacked sufficient probative value to sustain a finding of guilt and was insufficient as a matter of law. He contends that an identification based solely on the clothing he was wearing was insufficient to

establish that he was the perpetrator. He asserts that his convictions should be reversed.

Segura was charged with attempted theft and criminal mischief of over $300. A person is guilty of theft if he or she "takes, or exercises control over, movable property of another with the intent to deprive him or her thereof," Neb. Rev. Stat. § 28-511(1) (Reissue 1995), and a person is guilty of criminal attempt if he or she "[i]ntentionally engages in conduct which, under the circumstances as he or she believes them to be, constitutes a substantial step in a course of conduct intended to culminate in his or her commission of the crime," Neb. Rev. Stat. § 28-201(1)(b) (Cum. Supp. 2002). A person is guilty of criminal mischief if he or she "(a) Damages property of another intentionally or recklessly; or (b) Intentionally tampers with property of another so as to endanger person or property . . . ." Neb. Rev. Stat. § 28-519(1) (Cum. Supp. 2002).

Akin and Benzeiz first saw the perpetrator in Akin's SUV while the dome light was on. They saw him in the front seat of the vehicle and looking down at the "control panels" with his leg hanging out the open driver's-side door. When the perpetrator got out of the SUV, Akin and Benzeiz were within 10 to 12 feet of him in an illuminated parking lot. Akin testified that when the perpetrator got out of the SUV, she saw that he was about 6 feet tall and had a thin face, and she noticed he was wearing jeans, a burgundy Nike wind jacket with a white stripe on the sleeve, and a white baseball cap.

Benzeiz pursued the man on foot across the parking lot and observed him close to a nearby bank. Although Benzeiz temporarily lost sight of the man while getting into Akin's SUV, he and Akin spotted the man again when they reached the bank parking lot. Akin testified that from the bank parking lot, she saw the same man running along 20th Street. She testified it was obvious that it was the same man because she could see him running under a street light and he was wearing the same outfit she had seen earlier.

After turning onto 20th Street, Akin and Benzeiz saw the same man running near the front of the Loft building. Akin and Benzeiz circled a neighboring building and saw the same man wearing identical clothing at least two more times before he was finally

arrested by police officers. Segura was the man arrested, and he was wearing clothes matching the descriptions of Akin and Benzeiz. The pursuit and arrest took a total of 5 to 7 minutes. Both Akin and Benzeiz testified that they were certain Segura was the man they saw in the SUV and pursued until his arrest.

Akin testified that after Segura fled, she noticed that the stereo in her SUV was damaged. She also noticed that the console around the stereo had been partially cut away and damaged. Shortly after Segura's arrest, Akin and Benzeiz discovered that the triangular window of the back driver's-side door was broken. The State produced evidence demonstrating the damage totaled $581.56.

The evidence in the case before us is not so doubtful in character or lacking in probative value that a finding of guilt upon such evidence cannot be sustained. There was sufficient evidence for a jury to find beyond a reasonable doubt that Segura was the perpetrator of the crimes of which he was convicted. Therefore, Segura's assignment of error is without merit.

### Excessive Sentences

Segura argues that his sentences, although within statutory limits, were nevertheless excessive and constituted an abuse of discretion by the district court.

Attempted theft is a Class III misdemeanor, which is punishable by a penalty of 0 to 3 months' imprisonment, a $500 fine, or both. Neb. Rev. Stat. § 28-106 (Cum. Supp. 2002). Segura was sentenced to a term of 2 months' imprisonment for his attempted theft conviction.

At the time Segura committed the offense, criminal mischief causing pecuniary loss in excess of $300 was a Class IV felony, which is punishable by a maximum of 5 years' imprisonment, a $10,000 fine, or both. See Neb. Rev. Stat. § 28-105 (Cum. Supp. 2002). Prior to his sentencing, the Legislature reclassified criminal mischief causing pecuniary loss between $500 and $1,500 as a Class I misdemeanor, and Segura was given the benefit of the change for purposes of his sentence. See § 28-519. A Class I misdemeanor is punishable by a penalty of 0 to 1 year's imprisonment, a $1,000 fine, or both. § 28-106. Segura was sentenced to a term of 1 year's imprisonment for his criminal mischief conviction.

■ Segura's sentences for attempted theft and criminal mischief were both within the statutory limits. Sentences within statutory limits will be disturbed by an appellate court only if the sentences complained of were an abuse of judicial discretion. *State v. Canady*, 263 Neb. 552, 641 N.W.2d 43 (2002). An abuse of discretion takes place when the sentencing court's reasons or rulings are clearly untenable and unfairly deprive a litigant of a substantial right and a just result. *State v. Faber*, 264 Neb. 198, 647 N.W.2d 67 (2002).

The district court reviewed the presentence investigation report and considered the statutory criteria for determining whether probation or incarceration would be more appropriate. The court also considered a handwritten statement by Segura, which it believed to be untruthful and disingenuous. The court stated that the letter was "counterproductive to any type of sentence of probation and would render a sentence of probation somewhat meaningless," considering the weight of the evidence in the case and the short time it took the jury to reach a unanimous decision.

The district court stated that it considered Segura's prior record in determining his sentence. The court noted two 1998 convictions in which Segura was given concurrent 90-day sentences. It explained that Segura was granted leniency in 1998 for similar crimes and that he did not take advantage of that leniency. It noted that part of the purpose of the 1998 sentences was to give Segura a warning and an opportunity to show that he could change his ways, but Segura had failed to do so.

Segura's sentences do not demonstrate that the district court abused its discretion. Therefore, Segura's assignment of error that the court abused its discretion by imposing excessive sentences has no merit.

## CONCLUSION

Finding no merit to Segura's assignments of error, we affirm the judgments of conviction and sentences of the district court.

AFFIRMED.

STEPHAN, J., participating on briefs.